UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

TEAMSTERS LOCAL UNION NO. 117,

Plaintiff,

v.

WASHINGTON DEPARTMENT OF CORRECTIONS,

Defendant,

JANE DOE 3, JANE DOE 4, and a class of similarly situated individuals,

Intervenors.

CASE NO. C11-5760 BHS

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING AS MOOT INTERVENOR'S MOTION FOR SUMMARY JUDGMENT

This matter comes before the Court on Intervenor Defendant Jane Doe Class's ("Class") motion for summary judgment (Dkt. 25) and Defendant Washington Department of Corrections' ("DOC") motion for summary judgment (Dkt. 26). The Court has considered the pleadings filed in support of and in opposition to the motions and the remainder of the file and hereby grants the DOC's motion and denies as moot the Class's motion for the reasons stated herein.

ORDER - 1

# I. PROCEDURAL HISTORY

On September 21, 2011, Plaintiff Teamsters Local Union No. 117 ("Union") filed a civil rights complaint against the DOC alleging employment discrimination. Dkt. 1. On December 2, 2011, the Court granted the parties' stipulated motion allowing the Class to intervene. Dkt. 10.

On February 27, 2013, the Class filed a motion for summary judgment (Dkt. 25) and the DOC filed a motion for summary judgment (Dkt. 26). On March 18, 2013, the Union filed a combined response. Dkt. 32. On March 22, 2013, the DOC replied (Dkt. 35) and the Class replied (Dkt. 36).

# II. FACTUAL BACKGROUND

This case requires the Court to review the DOC's hiring practices at two of its correctional facilities for women inmates. The DOC operates two such facilities: the Washington Corrections Center for Women ("WCCW") located in Gig Harbor, and the Mission Creek Corrections Center for Women ("MCCCW") located in Belfair.

In 2007, a class of female offenders filed a lawsuit alleging sexual misconduct by male officers. In response to the lawsuit, the DOC retained three consultants to review security procedures for protecting female offenders from sexual misconduct, review DOC's sexual misconduct enforcement practices, and examine specific sexual misconduct complaints. Dkt. 27, Declaration of Kara A. Larsen ("Larsen Dec."), Exh. D at 3. During the pendency of that lawsuit, the DOC, based on the consultants' recommendations, began to implement measures that would increase the security, safety, and privacy of female inmates. In 2010, the parties settled the lawsuit with the DOC

1  agreeing to implement specific measures to prevent sexual misconduct. *Id*. at 2. In
2  addition to these measures, the DOC determined that it also needed to designate certain
3  positions to be staffed only by female corrections officers. *Id*., Exh. 1 at 48.
4       Prior to designating any positions as female-only, the DOC sought review of the
5  proposed bona fide occupational qualification ("BFOQ") designations by the Washington
6  Human Rights Commission ("HRC"). The HRC is the state agency charged with
7  administering and enforcing the state law against discrimination. RCW 49.60. On May
8  15, 2008, the DOC sent a letter and a "Privacy Post Request" and Position Description
9  supporting each position it was seeking to designate female-only. *See* Larsen Dec., Ex. D
10 ("HRC Request"). The DOC asked the HRC to authorize sixty-six (66) positions at
11 WCCW and eighteen (18) positions at MCCCW as follows:

> WCCW: Twenty-seven (27) housing unit positions, four (4) response and movement ("R&M") positions, two (2) work crew positions, twenty-three (23) relief positions, one (1) visiting position, one (1) intake/reception position, two (2) industries positions, two (2) programs & activities positions, one (1) external movement position, and three (3) hospital watch positions.
> MCCCW: Three (3) housing unit positions, one (1) R&M position, four (4) work crew positions, one (1) programs and activities, and nine (9) relief positions.

17 *Id*.
18      The DOC explained its reasons for requiring the positions and benefits of
19 imposing the female-only positions. First, the DOC stated that

> These positions are required to search and process offenders including pat search and strip search requirements. Additionally, female staff is necessary to accommodate Sick Leave (S/L) Relief, Authorized Leave (AIL) Relief, and Regular Day-Off (ROO) relief positions.

*Id.* Second, the DOC stated that the positions would "reduce the risk of sexual misconduct, reduce allegations of sexual misconduct, and protect male staff exposed to vulnerable situations." *Id.* at 1. The female-only positions would result in improved security of the facilities and safety of offenders. *Id.* The positions identified needs to conduct pat and strip searches, observe urinalysis collection, and observe female offenders in various states of undress while showering, toileting, and changing clothes. *See, e.g., id.* at 8.

The HRC reviewed the DOC's requested female-only positions, conducted site visits, interviewed staff and administrators, sought additional information in writing, and reviewed related materials. *See* Larsen Dec., Ex. E. On February 5, 2009, the HRC issued its opinion in a series of letters that designating the positions as female-only were justified as a "BFOQ" and there were no reasonable alternatives to female-only positions. *See* Larsen Decl., Ex. F.

### III. DISCUSSION

As a threshold matter, the Court must determine what positions the Union actually disputes. In the complaint, the Union alleges that

> DOC improperly designated many positions as female-only without undertaking a proper analysis of those positions to determine whether being female was, in fact, a bona fide occupational qualification for each designated position.

Dkt. 1, ¶ 54. Both the DOC and the Intervenors move the Court to enter judgment as a matter of law that the "DOC's designation of eighty-four (84) corrections officer positions at its women's correctional facilities as female-only meets the criteria for the

1  [BFOQ] exception to the prohibition on gender discrimination." Dkt. 26 at 2.  With

2  regard to some of the positions in dispute, the Union has either conceded the issue or

3  failed to dispute the DOC's contention that the position meets the BFOQ exception.  For

4  example, the Union "does not dispute the BFOQ designations for the R&M positions, so

5  this resource will remain available to meet the operational need to pat search female

6  inmates." Dkt. 32 at 6.  The Union also does not contest the DOC's assertion that the

7  Union conceded that one-on-one suicide watch positions and intake positions meet the

8  BFOQ exception.  Dkt. 26 at 7.  Therefore, the Court grants the DOC's motion for

9  summary judgment on these positions.

10  With regard to other specific positions, the DOC contends that the Union

11  necessarily conceded that some positions meet the BFOQ exception.  Dkt. 35 at 11–12.

12  First, the DOC argues that the Union implicitly concedes that positions in minimum

13  security housing units meet the BFOQ exception based on the substance of an expert

14  report stating that "the large majority of the incidents of sexual assault occurred in the

15  minimum security living arrangements." Dkt. 32 at 25.  Upon review of the Union's

16  brief, the Court agrees with the DOC's contention.  Therefore, the Court grants the

17  DOC's motion as to minimum security housing positions and will address the merits of

18  the medium and close security housing positions.

19  Second, the DOC argues that the Union necessarily conceded that certain relief

20  positions meet the BFOQ exception.  Specifically, the DOC argues that the Union

21  "necessarily acknowledges that relief positions that cover BFOQ posts on the two regular

22  days off each week are appropriately BFOQ." Dkt. 35 at 12.  The Court agrees because

the Union "submits that DOC's designation of vacation and sick leave relief positions as BFOQ female only is overbroad." Dkt. 32 at 29. Therefore, the Court grants the DOC's motion as to regular relief positions and will assess the merits as to non-regular relief positions, such as vacation and sick leave.

**A.    Summary Judgment Standard**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must

meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255). Conclusory, nonspecific statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

**B.     The Instant Motions**

Under Title VII, it is unlawful for an employer to discriminate on the basis of sex with respect to an employee's compensation or in the terms, conditions, or privileges of employment, or to "limit, segregate, or classify" on the basis of sex in any way that deprives an employee of employment opportunities or adversely affects his or her employment status. 42 U.S.C. § 2000e–2(a)(1) & (2). A defense exists when an employee's sex qualifies as a BFOQ that is "reasonably necessary to the normal operation of that particular business or enterprise." 42 U.S.C. § 2000e–2(e). The BFOQ defense is an "extremely narrow exception to the general prohibition of discrimination on the basis of sex" that may be invoked "only when the essence of the business operation would be undermined" by hiring individuals of both sexes. *Dothard v. Rawlinson*, 433 U.S. 321, 333–34 (1977) (citing *Diaz v. Pan Am. World Airways, Inc.*, 442 F.2d 385, 388 (5th Cir. 1971)). To justify discrimination under the BFOQ exception, an employer must

1       prove by a preponderance of the evidence: 1) that the job qualification justifying the discrimination is reasonably necessary to the essence of its
2       business; and 2) that [sex] is a legitimate proxy for the qualification because (a) it has a substantial basis for believing that all or nearly all
3       [men] lack the qualification, or . . . (b) it is impossible or highly impractical . . . to insure by individual testing that its employees will have the
4       necessary qualifications for the job.

5  *EEOC v. Boeing Co.*, 843 F.2d 1213, 1214 (9th Cir. 1988) (quotations omitted).

6       Under these standards, the Court will first address the issues of injury and

7  deference to the DOC's decisions. The Court will then proceed to consider whether each

8  challenged position meets the BFOQ exception.

9       **1.   Injury**

10      If the challenged employment policy imposes only a *de minimus* restriction on

11  employees' employment opportunities, then the employees have failed to show a tangible

12  job detriment that amounts to actionable injury under Title VII. *Robino v. Iranon*, 145

13  F.3d 1109, 1110 (9th Cir. 1998).

14      In this case, the DOC argues that the Union has failed to present any evidence to

15  any specific member. Dkt. 35 at 11. The Court agrees and finds that the hypothetical

16  injury submitted via the testimony of the Union representative is not evidence that creates

17  a material question of fact as to the issue of injury. Dkt. 32 at 14. Therefore, the Court

18  grants the DOC's motion for summary judgment because the Union has failed to submit

19  evidence of actual injury. In the event that an inference of injury may be drawn from the

20  Union's "evidence," the Court will alternatively address the merits of the dispute.

21

22

**2.   Deference**

The DOC and the Intevenors argue that the prison administrators' decisions are entitled to deference. Dkt. 26 at 9–10; Dkt. 25 at 13. The Union disagrees and asserts that "[a]bsolutely every case cited by [the DOC] in support of its plea for deference involves prison inmates." Dkt. 32 at 17 n. 3. While some cases cited by the DOC involve conditions of confinement issues (Dkt. 26 at 9–10), the DOC cites cases where the rule of deference has been applied to Title VII issues. For example, in *Breiner v. Nevada Dept. of Corrections*, 610 F.3d 1202 (9th Cir. 2010), the Ninth Circuit stated that "[j]udgments by prison administrators that are the product of a reasoned decision-making process, based on available information and experience, are entitled to some deference." *Id*. at 1212, n. 6 (citation and internal quotation omitted). Therefore, although some qualifications must be met before the Court may afford deference, the Court may defer to the DOC's hiring policies and the Union's arguments to the contrary are rejected.

**3.   The Positions**

In this case, the Union challenges the DOC's designation decisions as to (1) programs and activities positions (Dkt. 32 at 24–25); (2) housing unit positions (*id*. at 25–27); (3) work crew positions (*id*. at 27); and (4) relief positions (*id*. at 28–29). The Court considers each position below.

**a.   Programs and Activities**

The DOC designated three program and activities positions as female only. Dkt. 26 at 6. The Union contends that these designations are "indefensible." Dkt. 32 at 24. The Union asserts that the "only proffered rationale in the record for these designations is

the need to perform pat searches." *Id*. The DOC disagrees and cites substantial evidence in the record in support of the exception. Dkt. 35 at 7–8. For example, the DOC's request for review of the proposed exception provides in part as follows:

> This position must conduct pat and strip searches of female offenders entering and leaving the facility. The officer must do hourly checks (or more often) within all areas within their zone of responsibility. When relieving unit officers for breaks they would conduct room checks and monitor through observation windows and may encounter female offenders in varying states of undress while showering, toileting, and dressing. Random urinalyses draws must be conducted, as necessary. During the entire process of urinalysis collection, the officer must observe the female offender. Failure to properly search female offenders assigned to outside work crews has resulted in two prior incidents of offenders being able to escape from outside work crews.
>
> ***
>
> This living unit has the potential for invasions of female offenders' privacy. The officer does room Checks, enters rooms, rest rooms, and shower areas at any time to maintain the security and safety of the facility. Security and safety concerns do not allow the use of privacy curtains and courts have determined that these types of partitions do not provide sufficient privacy from male staff. To assist in performing the duties of pat/strip searches and avoid removing female officers from their assigned posts, a female Corrections Officer is being requested as a BFOQ post.
>
> ***
>
> No options other than a BFOQ for female staff are available to prevent the issue of privacy invasion as applied by the courts. Washington State law does not allow cross-gender pat searches and strip searches to be conducted by male staff on female offenders. Eliminating the strip search of offenders upon reentry to the facility would increase the introduction of contraband into the facility. This position may be required to observe urinalysis collection. Not observing the offenders during the entire process of urinalysis collection significantly impacts the reliability of the test results and impacts the ability to control chain of evidence, so is not feasible. Substitution of a female staff from another post is not viable, due to the negotiated labor contracts that require assignments of posts determined by seniority of staff. Removing a female staff, if available, from one post to cover another post or to perform a search, creates a gap for dealing with privacy issues at the post vacated.

HRC Request at 77–78 (MCCW request); *see also id*. at 462–463 (WCCW request shift 3) & 472–473 (WCCW request shift 2). The Court finds that these judgments are products of a reasoned decision-making process, based on available information and experience, and are, therefore, entitled to some deference. *Breiner*, 610 F.3d at 1212. This finding, however, does not end the inquiry because a "BFOQ can be established only by 'objective, verifiable requirements [that] concern job-related skills and aptitudes.'" *Id*. at 1216 (quoting *Int'l Union, UAW v. Johnson Controls*, 499 U.S. 187, 202 (1991)).

In *Breiner*, the Ninth Circuit reversed the district court's order granting summary judgment on the BFOQ issue. Although the court concluded that the Nevada Department of Corrections' ("NDOC") decisions were entitled to deference, the decisions were based on assumptions of the comparative employment characteristics of men in general and could not support BFOQ designation. *Id*. Specifically, the court concluded that the NDOC failed to meet its burden in showing a basis in fact for the conclusions

> that all male correctional lieutenants would tolerate sexual abuse by their subordinates; that all men in the correctional lieutenant role would themselves sexually abuse inmates; or that women, by virtue of their gender, can better understand the behavior of female inmates.

*Id*. Contrary to the proposed basis in fact in *Breiner*, the DOC has shown specific and legitimate basis in fact to support the female only BFOQ. For example, the position in question requires that the officer perform searches of the inmates and allows for situations where the officer must be present when the inmate is either partially or fully nude. Moreover, the officer must conduct urinalysis of inmates, which requires strict

chain of custody demands and observing the inmate urinating.  The Court finds that the DOC has met its burden in providing a basis in fact for the female-only position.

The Union, however, argues that there are reasonable alternatives and asserts that the DOC has failed to provide a legitimate reason why the female-only required tasks could not be performed by an R&M officer "as was the case for decades." Dkt. 32 at 24.  First, it's undisputed that the way matters were handled in the past led to civil rights lawsuits.  Second, the DOC's request specifically addresses the issue of reasonable alternatives:

> Substitution of a female staff from another post is not viable, due to the negotiated labor contracts that require assignments of posts determined by seniority of staff. Removing a female staff, if available, from one post to cover another post or to perform a search, creates a gap for dealing with privacy issues at the post vacated.

HRC Request at 77–78 (MCCW request).  Based on these facts, the DOC has shown that requiring an R&M officer to respond to every female-only situation is not a viable alternative.  Therefore, the Court grants the DOC's motion for summary judgment as to the program and activities positions.

### b.     Housing Unit Positions

The DOC implemented BFOQ female-only positions for three housing unit positions at MCCCW and twenty-seven housing unit positions at WCCW.  The Union concedes any argument with regard to minimum security, single staffed positions.  *See above*.  This concession leaves eighteen positions at WCCW in dispute.  These positions are apparently double staffed and the DOC implemented the BFOQ female-only positions for the first position on each shift in each particular higher security unit.  The Union

1 contends that "there is absolutely no evidence to support the conclusion that designating

2 the first position on every shift in every housing unit as female only increases the safety

3 of inmates." Dkt. 32 at 26. While there appears to be questions of fact regarding whether

4 this specific designation increases the safety of inmates, the questions are not material

5 because the DOC's reasons for the BFOQ request were not based on inmate safety.

6 Therefore, the Court will address the DOC's stated reasons for the requests.

7       The DOC contends that "women staff are necessary to perform the basic security

8 searches and to protect women prisoners' privacy interests." Dkt. 25 at 18. Specifically,

9 a sample BFOQ privacy post request provides in part as follows:

> This position must conduct strip searches of female offenders entering and leaving the unit and observe showers, toileting, and dressing. Officer must do hourly (or more often,) room checks and monitor through observation windows. During the room checks the officer may encounter female offenders in varying states of undress. Random urinalyses draws must be conducted, as necessary. During this process, the officer must observe the female offender.
> 
> \*\*\*
> 
> This unit houses female offenders allowing for potential invasions of privacy, as offenders must be observed as they shower, dress, and use the toilet. Male staff cannot observe the female offenders when they are engaged in these activities.
>
> \*\*\*
>
> The Medium Security Unit houses up to 256 offenders. A female Correctional Officer is required for site operations in order to maintain the security and safety of the facility, and to ensure that the privacy of female offenders is adhered to according to Department policy and case law.
>
> \*\*\*
>
> The use of privacy curtains/partitions may present safety and security concerns, and have been determined by the courts to not provide adequate privacy from male staff. To assist in performing the duties of pat and strip searches and avoid removing female officers from their assigned posts, a female Corrections Officer is being requested as a BFOQ post.
>
> \*\*\*

1         No options other than a BFOQ for female staff are available to prevent the issue of privacy invasion as applied by the courts. Washington State law does not allow cross-gender pat searches and strip searches to be conducted by male staff on female offenders. Eliminating the strip search of offenders at the end of visiting or upon their admission to segregation would increase the introduction of contraband into the facility. This position may be required to observe urinalysis collection. Not observing the offenders during the entire process of urinalysis collection significantly impacts the reliability of the test results and impacts the ability to control chain of evidence, so is not feasible.

        Substitution of a female staff from another post is not viable, due to the negotiated labor contracts that require assignments of posts determined by seniority of staff. Removing a female staff, if available, from one post to cover another post or to perform a search, creates a gap for dealing with privacy issues at the post vacated.

HRC Request at 326–327. In light of these concerns, the Court finds that the DOC's judgments are entitled to deference and that the DOC has met its burden in providing a basis in fact for the female-only position. Regardless, the Union attacks both inmate privacy concerns and the women-only job functions.

With regard to the privacy concerns, the Union argues that "female inmates are inmates, and therefore are not entitled to expect the same degree of privacy as men and women who are not incarcerated." Dkt. 32 at 26. While this may be true as to some privacy issues, observation by a male officer while nude does not appear to be a justified condition of confinement for female inmates. With regard to the less intrusive pat searches, federal law and DOC policy reserve such searches by male guards on female inmates to the most serious emergencies. *See, e.g.*, 28 C.F.R. § 115.5 ("Exigent circumstances means any set of temporary and unforeseen circumstances that require immediate action in order to combat a threat to the security or institutional order of a facility.") Moreover, the Union fails to supply any facts refuting the DOC's contention

1 that the BFOQ exception is being requested to "to ensure that the privacy of female
2 offenders is adhered to according to Department policy and case law." HRC Request at
3 326. Therefore, the Court finds that the Union has failed to establish material questions
4 of fact as to this legitimate basis in fact.

5 With regard to female-only job functions (pat searches, strip searches, and
6 urinalysis samples), the Union contends that "those duties can be (and have been)
7 performed by R&M officers . . . ." Dkt. 32 at 27. The fact that privacy issues were
8 handled differently in the past does not create a material question of fact as to the DOC's
9 BFOQ request. The DOC is required to show that, without the job qualification, "the
10 essence of the business operation would be undermined . . . ." *Dothard*, 433 U.S. at 333.
11 The DOC has show that, by requiring an R&M officer to respond to a housing unit, may
12 not be feasible and "creates a gap for dealing with privacy issues at the post vacated."
13 HRC Request at 327. Failing to respect the privacy interests of all inmates at all posts
14 obviously undermines the essence of the center's operations by exposing inmates to
15 potential privacy violations and the DOC to potential civil rights violations. Therefore,
16 the Court grants the DOC's motion for summary judgment on these housing unit
17 positions.

18     **c. Work Crew Positions**

19   The DOC designated six work crew positions as female-only. Dkt. 26 at 6. The
20 Union argues that these designations were "improper." Dkt. 32 at 27. The Union's
21 arguments appear to be based on the fact that there was no allegation that sexually
22 inappropriate activity occurred with respect to officers on work crew. The DOC,

however, based its request on the actual duties of the work crew officer. *See, e.g.,* HRC Request at 141–142. For example, the DOC stated that the officer is responsible for individually escorting groups of inmates to work projects outside the institution and, as a result, "[a]pproximately 80% of the duties assigned to this post are related to pat/strip searches of female offenders." HRC Request at 141. Moreover, "[e]scorting officers are required to keep constant audio or visual surveillance of offenders working in the community and includes the offenders' access to restroom facilities." *Id.* The Court finds that the DOC has shown that the female only job qualification is necessary to properly perform the duties of the work crew position. Therefore, the Court grants the DOC's motion for summary judgment on these positions.

          **d.    Relief Positions**

The DOC designated as BFOQ female only twenty-three relief positions at WCCW and nine relief positions at MCCCW. Dkt. 26 at 6. In support of these positions, the DOC made specific BFOQ requests (*see, e.g,* HRC Request at 642–643) and the Human Rights Commission issued an opinion granting the qualified positions (Larsen Dec., Exh. F at 45–50). The Union asserts, without support, that the DOC "overstated" the required number of such positions. Dkt. 32 at 28. The Union argues that "this is a matter that must be reserved for trial because the Court cannot assess whether the relief sought was excessive without conducting a careful analysis of all such positions." *Id.* Contrary to the Union's position, the Union may not merely state that it will discredit the DOC's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. Conclusory, nonspecific statements in

1 affidavits are not sufficient, and missing facts will not be presumed. *Lujan*, 497 U.S. at
2 888–89 (1990). The Court finds that the Union has failed to show that any material
3 questions of fact exist to overcome the DOC's motion for summary judgment and
4 abundance of evidence in support of its motion. The DOC's judgments are entitled to
5 deference and it has shown legitimate basis in fact for each position. Therefore, the Court
6 grants the DOC's motion for summary judgment as to the relief positions.

## IV. ORDER

Therefore, it is hereby **ORDERED** that the DOC's motion for summary judgment (Dkt. 26) is **GRANTED** and, although informative and helpful, the Intervenor's motion for summary judgment (Dkt. 25) is **DENIED as moot**. The Clerk shall enter **JUDGMENT** for the DOC against the Union and close this case.

Dated this 8th day of April, 2013.

BENJAMIN H. SETTLE
United States District Judge